STATE, DELAWARE, LACKAWANNA AND WESTERN RAIL-ROAD COMPANY, PROSECUTORS, v. EAST ORANGE.

1. The act approved March 10th, 1873, (*Pamph. L.*, *p.* 327, § 4,) authorizing the township of East Orange to pass ordinances to compel any railroad company to station and maintain flagmen wherever such railroad may cross any streets or highways in said township, is a valid exercise of legislative power, as a police regulation for the safety of the public and passengers on the trains.

2. Such ordinance, when passed, is a judicial act, imposing pecuniary burden and loss on the railroad company, and is subject to review in this court, which will determine whether the power conferred has been exercised in a legal and reasonable manner.

---

On *certiorari* to set aside an ordinance.

The prosecutors are the lessees of the Morris and Essex railroad, which runs through the township of East Orange, and is used by them in carrying on their business. On the 14th day of January, 1878, the township committee of the township of East Orange passed an ordinance requiring the prosecutors forthwith to station and maintain, in the daytime and in the evening until nine o'clock, at the point where their railroad tracks cross each of the following named streets, to wit, Burnet street, Clinton street, and Halsted street, in the township of East Orange, a person with a flag and lighted lamp or lantern, to give warning of the approach of the locomotive engines and railroad cars, under a penalty, &c.

Special powers were given to the township by an act of the

legislature approved March 10th, 1873, and among them, the power to pass, alter, and repeal ordinances "to compel any railroad company to station and maintain flagmen wherever such railroad may cross any streets or highways in said township, and to maintain a fence and gates wherever such railroad may cross Main street, in said township." *Pamph. L., p.* 327, § 4.

The act to incorporate the Morris and Essex Railroad Company was approved January 29th, 1835, and authorized them to survey, lay out, and construct a railroad from Morristown to Newark; to place on it all machines, engines, wagons, carriages, or vehicles for the transportation of persons, or any species of property thereon as they might think reasonable, expedient, or right, and to charge certain rates of passage or transportation. It was declared to be a public highway, and the act was to be deemed and taken as a public act.

By section nine, it was made the duty of the company to construct and keep in repair good and sufficient bridges or passages over or under the said railroad or roads, where any public or other road shall cross the same, &c.

In section twenty, the legislature reserve to themselves the right to alter, amend, or repeal the act whenever they think proper. The Morris and Essex railroad, from Morristown to Newark, was put in use to carry passengers and freight, in the latter part of 1837 or the spring of 1838.

Clinton street was opened in April, 1869, Halsted street at the same time, and Burnet street in April, 1872. There is some evidence that there was an old driftway, at the time the railroad was located, running from the main street down across the field, and about where Clinton street crosses the railroad track, but the exact location is uncertain.

Flagmen have been stationed by the company at several of the street crossings, including one at Clinton street. It also appears that about sixty trains pass over the railroad through East Orange each day, and that there had been an accident at Clinton street and one at Burnet street, to persons crossing these streets, within two years.

Del., Lack. & W. R. R. Co. v. East Orange.

The return further shows that, at a meeting of the township committee, held October 9th, 1876, a preamble and resolution were offered and adopted that, " whereas, in view of the recent death by the cars, on the Delaware, Lackawanna and Western railroad, at its crossing at Clinton street, and also in view of the continual danger existing not only on that street, but also on Burnet and Halsted streets, therefore, be it resolved that the committee on ordinances be directed to prepare an ordinance compelling the Delaware, Lackawanna and Western railroad to station and maintain a flagman at the railroad crossing of Burnet, Clinton, and Halsted streets, and submit the same to the committee for its action, at its next regular meeting." The ordinance was prepared, and presented at the time named. It was advertised; the company was heard by one of its agents; a committee of conference was appointed, who reported that the railroad company had stationed a flagman at Clinton street, but objected to place one at Burnet and Halsted streets, on account of the expense. November 12th, 1877, the committee directed their clerk to again notify the railroad company that unless a flagman or danger signal was placed at the Burnet street crossing, the committee would pass the ordinance which was read November 13th, 1876. At the regular meeting held January 14th, 1878, the ordinance was passed.

Argued at November Term, 1878, before Justices DALRIMPLE, DEPUE, and SCUDDER.

For the plaintiffs, J. Vanatta.

For the defendants, J. L. Munn.

The opinion of the court was delivered by

SCUDDER, J. The reasons assigned for setting aside this ordinance are, that there was no power in the township committee to pass it, and none in the legislature to authorize it. It is argued that these three streets—Clinton, Burnet and

Halsted streets—have all been opened since the construction of the Morris and Essex railroad, under the charter; and that their lessees, the Delaware, Lackawanna and Western railroad, owe no such duty to the inhabitants of East Orange township as is now put upon them by this ordinance. It cannot, however, be said that they owe no duty to the public with reference to their use of those streets. It is true that in the construction of their road the corporation could only be required to make such bridges, passages and crossings as were needed and suitable at the time the railroad was built, to accommodate the public in the use of highways then existing. The effect of this provision in their charter and in others, as applied to highways, is simply to enforce a common law obligation, and guard against any nuisance by the company in the construction of their road. *Morris Canal and Banking Co.* v. *State*, 4 *Zab.* 62.

The public have, however, the right to lay roads over the railway tracks, and use them in crossing as part of such highways. In such use, all persons who pass over them, properly exercising the right to travel on the public highways, will be protected. The right of both parties to be on the railroad track is assured, and each owes a duty to the other while there. After the company have constructed their road, therefore, new obligations may be imposed upon them by new conditions arising after the road has been built, which do not relate to the construction but to the common use of highways by the railroad and by the public.

It is familiar law that a railroad company must exercise care and diligence in running their trains over a public street or highway, with reference to all persons rightfully on such street or highway, and without regard to the time when it was opened, whether before or after the railroad was constructed.

And this necessary care and diligence may involve additional expense to the company beyond the cost of the original construction of the road and its proper management at the time it was completed. As travel and business increase, and new inventions are brought into use; as population becomes

greater and centres of business grow up about the lines of these roads, there are additional charges put upon them. After the date of the charter of this company, and the construction of their road, many duties have been imposed upon them by the legislature, and their right to do so has not been questioned. They are required by general laws to erect signboards, to place bells or steam-whistles on every locomotive and use them in a prescribed way, and are liable to penalties for not giving such signals. They must have a rope or cord attached to the bell, gong or whistle on the locomotive and running through the train; the duty is also imposed to use all practicable means to prevent the communication of fire from any locomotive in passing or being on a railroad, to any property of an adjacent land owner or occupant; and they must provide screens or covers for the smokestacks on their engines to prevent the escape of fire. By a late statute, oil cars shall not pass any passenger train of any railway company in any tunnel or upon any bridge of more than one hundred feet in length. Other like requirements are found in the statutes of other states. These are general laws applicable to all railways in the state. There are also special sections in the charters of some cities authorizing the common council to pass ordinances to regulate the speed and running of locomotive engines and railroad cars through said cities; but such regulation is limited to the streets, squares and public grounds. They are also prohibited from stopping their trains for an unreasonable time on such places. *State* v. *Jersey City*, 5 *Dutcher* 170.

It is clear from the citations above made that when the privilege is given to a railroad company to cross public highways then existing, or that may afterwards be laid, it is not exempted from the common law duty of taking reasonable care to enable the public to use the highways with safety; and where there is such duty, a corresponding right exists in the legislature to enforce its performance by appropriate legislation. This right, based on the principle of the duty of the state to secure the safety of the public, can only be

abridged by express reservation, or by plain implication from the nature of the privileges and franchises granted in the charter, and it is even doubted whether the legislature can limit the obligation to discharge this important duty. There is no such reservation or implication in this charter, which contains only the usual grant of the franchise, to make, maintain and operate a railway, to condemn lands and materials for that purpose, and receive certain fares and tolls.

In the original charter, and in the supplement of 1865, there is a limit on taxation, which has been recently held to be an irrepealable contract. *State of New Jersey* v. *Yard,* 5 *Otto* 104. But this ordinance is not an exercise of the power of taxation in form or in principle, nor is it taking the property of one for the benefit of another, without compensation. All these arrangements, by which burdens are put upon the company of a character different from any others in the charter, are necessary for the protection of the passengers and freight conveyed on the road as well as for the safety of the public. They tend also to protect the company from the consequences of negligence on the part of their agents. They are thus in furtherance of the purposes for which the road was instituted—the rapid, convenient and safe transit of persons and property along the line of the railway. Nor can these correlative effects be separated or distinguished by the suggestion that this is an exercise of the taxing power and for the benefit of the public only. Protection to the public is protection also to the corporation and to the persons and property for which it is responsible.

It is evident that the legislature may thus require additional precautions of railway companies, involving expense to them, to prevent injuries to persons and property within and without their cars, while exercising their franchises under their charter. Such requirements are in the nature of police regulations, and do not conflict with the constitution, because they take away no vested rights, nor do they interfere with or impair the powers conferred on the company by the act of

incorporation. The essential franchises of the corporation are not disturbed.

This subject is fully considered in 2 *Redfield on Railways*, (4th ed.) ch. 32, § 2, ¶ 232, and in the notes and cases to which reference is there made. *State* v. *Noyes*, 47 *Me.* 189; *Thorpe* v. *Rutland and Burlington R. R. Co.*, 27 *Vt.* 140; *Bulkley* v. *N. Y. & N. H. R. R. Co.*, 27 *Conn.* 479; *Galena and Chicago R. R. Co.* v. *Loomis*, 13 *Ill.* 548; *Staats* v. *Hudson River R. R. Co.*, 3 *Keyes* 196; *Frankford, &c., R. R. Co.* v. *Philadelphia*, 58 *Penna. St.* 119.

In a late case, (*People, ex rel. Kimble*, v. *B. & A. R. R. Co.*, 70 *N. Y.* 569,) the court say that the legislature may make such regulations as are appropriate to protect the lives of persons carried upon railroads or passing upon highways crossed by railroads. Such legislation violates no contract, takes away no property, and interferes with no vested right. All this is within the domain of legislative power, although the power to alter and amend the charters of such corporations has not been reserved. In this case, the power to alter and amend is reserved, and that question is not, therefore, important.

It will be found that while, in some cases, the legislature have imposed these additional burdens on all the railway corporations by general laws, they have, in others, empowered commissioners, or municipal bodies, to apply them in their discretion. Here the common council may pass an ordinance to compel any railroad company to station and maintain flagmen wherever such railroad may cross any streets or highways in said township of East Orange, by the express terms of the charter. In the exercise of this authority, the common council are called upon to use a judicial discretion. Their ordinance, when passed, will put a pecuniary burden and loss on the railroad company, and must, therefore, be subject to review in this court, as a judicial act. If the ordinance comes within the principle above stated, and has been passed in due form, and if the power conferred by the legislature has been exercised in a reasonable manner, then the ordinance will be

binding; if not, then it will be the duty of the court to set it aside.

There is no question made that all the required forms were used in the passage of this ordinance, but its special require- ment of a flagman to be stationed at each of these three streets—Clinton, Burnet, and Halsted streets—is disputed as a legal act.

It is obvious that the legislature have intended to enlarge the common law liability of these prosecutors, for, as a gen- eral rule, a railroad company is not bound to keep a flagman at the points where its road intersects public highways. *Del., Lack. & W. R. R. Co.* v. *Toffey*, 9 *Vroom* 525.

It is only required to do so when the company so construct the road as to make it unnecessarily hazardous. The rule, as expressed in our state, is that, when the company has created extra danger, it is bound to use extra precautions, and this may demand the placing of a flagman at a crossing. *Penna. R. R. Co.* v. *Matthews*, 7 *Vroom* 531.

Like conclusions have been reached in late English cases. *Stubley* v. *L. & N. W. R. Co.*, *L. R.*, 1 *Ex.* 13; *Stapley* v. *L., B. & S. C. R. Co.*, *L. R.*, 1 *Ex.* 121.

That this common law liability may be increased by statute, cannot be denied, but it is not necessary to say, in this case, to what extent it may be carried. It is certain that it may go so far as is contemplated in this act, to protect the streets and highways of a densely populated district, where there are extra hazards—where both the passengers on trains and travelers on the highways are exposed to extraordinary risks by the passage of sixty trains in a day.

I find no want of power in the legislature to pass the act giving authority to the common council to enact this ordi- nance, and no violation of the law or abuse of the discretion committed to them in passing the ordinance.

The *certiorari* will be dismissed, with costs.